# CHARLESTON

## STATE v. KING *et al.*

Submitted November 16, 1908. Decided December 22, 1908.

1. TAXATION—*Sale—Redemption.*

   Redemption of lands, title to which has become vested in the State by forfeiture or sale, is a mere grace or privilege extended by the State, which it may directly withdraw, or which it may deny before actual redemption by grant of the lands to another than the former owner. (pp. 616, 617.)

2. SAME—*Disposition of Property.*

   Lands once sold by the State, or on its behalf, as forfeited to or vested in the State, cannot again be sold as such, nor redeemed,

in any other proceeding, unless there has been a subsequent forfeiture to or vesting in the State of the title acquired at the first sale. (p. 618.)

3. Same—*Redemption—Priorities.*

The owner of a valid title originating by reason of the first sale has, in regard to a subsequent forfeiture to or vesting in the State, right of redemption superior to that of the former owner. (p. 623.)

4. Same—*Forfeiture—Redemption.*

Lands once sold by the State, being, under chapter 105 of the Code, again involved in a suit in which it appears that a valid title originating at the first sale is again in the State because of failure to redeem within a year from a sale for delinquent taxes, but that the taxes have in fact been paid into the treasury as for a redemption, and that the State does not complain, are properly dismissed by the court on motion of the owner of such title. The dismissal operates as a redemption on his behalf. (p. 623.)

Appeal from Circuit Court, Marion County.

Suit by the State against H. C. King and others. Decree dismissing lands of Buskirk and others, and King appeals.

*Affirmed.*

Maynard F. Stiles, for appellant.

John F. Dillon, Harry Hubbard, C. W. Campbell, Edward C. Lyon, Sheppard, Goodykoontz & Scherr, Brown, Jackson & Knight, W. B. Cornwell, Lilly & Shrewsbury, Anderson, Strother & Hughes, Frank Cox, and George J. McComas, for the State.

Robinson, Judge:

In this case opinions upon other questions than the ones now to be discussed are delivered herewith. It is well to refer to these for an understanding of the general character of the case and matters involved in it. It is also proper to refer to decisions in this case as reported in 47 W. Va. 437 and 60 W. Va. 607. In this appeal from the decree of January 11, 1908, distinct facts are involved. Many of the questions governing them, however, have been determined in the other opinions. For this reason, we shall, as far as practicable, avoid reiteration or extended discussion.

By the decree complained of, Buskirk, trustee, for him-

self and others represented by him, obtained a dismissal of certain lands claimed by them. Buskirk asked that the suit be dismissed as to these lands. King claimed the right to redeem. This was the simple issue between them. The court below granted the dismissal. Is such decree of dismissal right?

King's claim of title to the 500,000 acre Robert Morris grant is well recited in other opinions, to which we have referred; likewise, the location of the 480,000 acre grant to Morris, adjoining the other on the east. Their location and relation to each other have been heretofore fixed by decree of the court below and affirmed here. As determined as aforesaid, these two grants are distinct and do not interlock. And by that finding, the so-called "20,000 acres" claimed by Buskirk are not within the 480,000 acre grant, nor do they conflict with it. But a portion of the 20,000 acres is within the boundary as determined in this suit, by decree below and affirmance here, to be that of the 500,000 acre grant.

And now let us inquire as to the title upon which Buskirk claims. One Adams, in 1879, claimed to own the 480,000 acre grant. One of the deeds in his chain of title was forged, it seems. This would be important elsewhere, but, from the view we take of the case, it is not here. Adams conveyed the 480,000 acre grant to Jesse R. Irwin in the year aforesaid. Irwin paid no taxes. By proceedings on the part of the Commissioner of School Lands of Wyoming county, begun in 1881, in the circuit court of that county, the 480,000 acres were sold and purchased by Irwin. This sale was confirmed by the court's decree, in which McClure, commissioner as aforesaid, was directed to convey to the purchaser, reserving, as in the sale, all junior claims within the grant protected by the constitution and laws, and all lands therein sold by the Commissioner of School Lands. McClure, conveyed, as directed, to Irwin, on March 25, 1886. This deed, consistent with the proceedings leading to it, purported to convey the land by metes and bounds of the calls in the original patent and respected the reservations aforesaid, denominating the land as 40,000 acres—20,000 in Logan, 10,000 in McDowell and 10,000 in Wyoming county, be the same more or less. This

deed refers to the report of Sarver, a commissioner to whom said proceedings to sell had been committed, as usual for proper findings in such cases. The report made by Sarver, commissioner in that cause, contained only an estimation of the number of acres of land subject to sale and the taxes due thereon. In this report he locates 20,000 acres of the aforesaid 40,000 acres in Logan county. The decree of reference by which he was appointed commissioner authorized him to do such surveying as Irwin might direct. It seems pretty well established that he made a survey of the 480,000 acres, although a report of the same is not regularly a part of the proceedings in the case. That survey was made by his following the courses and distances of the old patent calls, and not confining the boundaries to the natural monuments called for in the grant. Of course, this made a much larger territory than it is now actually found to be. It reached out by courses and distances far to the north and west into Logan county, and covered the territory in which are the 20,000 acres now herein claimed by Buskirk. This reaching out made the 480,000 acres to extend over the 500,000 acre grant. Yet the 480,000 acres, by their true location as now determined, do not extend into the county of Logan. As we have said, they adjoin the 500,000 acre grant but in nowise conflict with it. Irwin was directing the survey of this land, and no doubt had it reach out as far as there was any pretense for doing. It may be that he was then anticipating and preparing for his purchase of the land in that proceeding which he afterwards consummated, as we have stated. Notwithstanding the true boundaries of the 480,000 acre grant make none of it to lie within Logan county, we must remember that the McClure proceeding called for 20,000 acres of the land to be in Logan county, 10,000 in McDowell, and 10,000 in Wyoming; and the deed of McClure, commissioner, to Irwin is consistent therewith. That deed and the report and decree upon which it is based call for 20,000 acres of the land thereby sold, after reserving junior claims protected by the constitution and laws and lands sold by the Commissioner of School Lands, to be in Logan county. Sarver's report located that land in Logan county. Part of the redemption money was apportioned to that

county.   To us it is clear that this proceeding and sale thereby of the unprotected and unsold portions of the 480,-000 acre grant were upon the theory of a consideration of it by its courses and distances, if not by an actual survey thereby.

It appears that after McClure conveyed to Irwin the latter made certain conveyances which led to a conveyance to Emma Idalia Pomeroy, dated July 28, 1893.   These intermediate conveyances did not specifically locate or describe the 20,000 acres.   The deed to Mrs. Pomeroy did.   It sufficiently locates and describes the land now claimed by Buskirk.   At that time the taxes were in default.   And Mrs. Pomeroy also neglected to pay taxes.   For the year 1894 it was returned delinquent in her name and for the year 1893 it was returned delinquent in the names of some of her predecessors in title.   In December, 1895, it was sold by the sheriff of Logan county for these delinquencies, bought by the State, and, not being redeemed as required by law, it became forfeited to the State.   Upon the making of a report to the circuit court of Logan county by Hinchman, Commissioner of School Lands of that county, that these 20,000 acres had become forfeited to the State and liable to be sold for the benefit of the school fund, as aforesaid, that commissioner was directed to commence proceedings for the sale of this land.   Such proceedings were begun at July Rules, 1897, in the name of the State.   These proceedings clearly show that the tract involved therein as forfeited under sale of delinquency in 1893 and 1894 as aforesaid, was the 20,000 acres in controversy.   Mrs. Pomeroy and former claimants to the title which had been conveyed to her were made defendants.   King, however, was not made a defendant in this suit.   After the cause had been committed to a commissioner and a report had been made by him, there was decree on April 29, 1898, ascertaining the taxes and interest then due and unpaid, and directing sale if the amount so ascertained and the costs were not paid within thirty days.   Hinchman, Commissioner of School Lands, was appointed to sell.   He made sale, as required by said decree, on the 18th day of October, 1898, and Stoddard and Hall became the purchasers.   On November 3, 1898, this sale was confirmed by decree, and Wil-

kinson was appointed a special commissioner to convey the land to the purchasers. He made a deed on the 12th day of November, 1898, in which, after reciting his authority to make it and the decree under which he acted, described the land as that portion of the 480,000 acre tract situated in Logan and Mingo counties sold by Hinchman, Commissioner of School Lands, to Stoddard and Hall, and further described it according to the old patent calls of the 480,000 acres. Mingo county had been formed from Logan since the Mc-Clure suit. But this deed recites that the land conveyed is 20,000 acres, and that it is expressly understood that no portion of the 480,000 acre tract outside of Logan and Mingo counties is intended to be conveyed thereby. True, here is confusion. The Wilkinson deed may be said to be irregular and and to an extent inconsistent with the proceedings upon which it is based. Most clearly the land sold to Stoddard and Hall by Hinchman, Commissioner of School Lands, pursuant to the proceedings aforesaid, was the 20,000 acres which had been conveyed to Mrs. Pomeroy, as hereinbefore stated. The record of said proceedings makes it clear that Stoddard and Hall purchased thereunder the land conveyed to Mrs. Pomeroy. Distinctly, that tract was involved in those proceedings after its forfeiture to the State. And quite as distinctly it was that tract that Stoddard and Hall purchased. But the Wilkinson deed to these purchasers is far from being clear that it conveyed the Pomeroy land, if in fact it does not wholly depart from the directions of the decree to convey that tract. Prior to the execution of this deed there is such regularity that one need not have any hesitancy in saying that it was the Pomeroy land which had become delinquent, forfeited to the State, and proceeded against and sold. The Wilkinson deed plainly is an uncertain step. King insists that it conveys the land conveyed by McClure, commissioner, to Irwin, observing its true bounds, and not the Pomeroy land. But it is significant to note that Wilkinson had no authority to convey any but the latter. Equally significant is it that this deed purports to convey 20,000 acres in Logan and Mingo counties, by its general terms. Such a tract, with which Mrs. Pomeroy was connected, had been sold in the Hinchman suit, and only such had Wilkinson been directed by decree

therein to convey. The whole record of the proceedings makes us to know that Wilkinson intended to convey the Pomeroy tract, however badly he may have failed in his purpose.

Buskirk, trustee, has become the owner of the Stoddard and Hall title. We have, therefore, seen the basis of his claim to the land. A large portion of the 20,000 acres is in the 500,000 acre Morris grant. And more is in this Morris grant as extended by courses and distances. King would have the right to redeem that portion were it not for the Buskirk claim. Has he lost his right to redeem because of the purchase of the land by Stoddard and Hall in the aforesaid Hinchman proceedings, or by reason of a right acquired by them and their successors in title by transfer under the constitution and laws?

This suit was pending in Wyoming county prior to the institution of the Hinchman suit and the sale to Stoddard and Hall thereunder. King claims the right to redeem this land by the decree of September 30, 1897, which antedated the sale to Stoddard and Hall. While the predecessors in title of Mrs. Pomeroy were parties to that suit, yet she was not when the decree of 1897 was entered, although she, owned the land when that suit was begun; neither was she nor Stoddard and Hall and their successors in title parties thereto pending the Hinchman proceedings in Logan county. We need not reiterate what has been said in other opinions herein as to this Wyoming decree of September 30, 1897, its standing and effect. All that is well stated elsewhere. Suffice it to say that while the 20,000 acre tract is to an extent within the 500,000 acre survey, the Wyoming decree cannot affect the former if it has been sold by the State, and the State's title has thereby been passed to another prior to a decree of actual redemption by King. It is conced that no such decree of actual redemption has yet been entered. What right exists in King by the Wyoming decree, as modified by the mandate of this Court upon appeal, that protects from the State's disposal any land within the bounds named until he consummates actual redemption by specifying the land and paying true amount therefor? The forfeited land is subject to disposal by the State until he pays full money for redemption and the

court pronounces a decree that the land is actually redeemed. To hold otherwise would vest in him a right never intended by this Court upon the former appeal herein, nor by the laws of the land. That decree, modified as aforesaid, is only the recognition of a right, subject to compliance on his part—not the vesting of a right, for he has not complied. By it King was not revested with the title. The title remains in the State until King obtains a decree of actual redemption.

The King title became forfeited and vested in the State with the year 1888. This was for non-entry on the land books. Thereafter it belonged to the State. Whatever property related to that title was distinctly the State's property. It could do with it as it pleased. It is not our purpose however, to discuss the reason and propriety of the forfeiture laws, their effect or validity. This is an old subject. It has been fairly and learnedly dealt with by others. These laws are the well settled policy of a growing and prosperous commonwealth. It would be a late day for this Court to disturb this policy that has been so fruitful of the State's growth and prosperity. Whatever may be said, and despite fine spun technicalities of constitutional construction to overthrow the principle, to the patriotic citizen or landowner, it is neither illegal nor inequitable for an owner of land to be divested of his title by his own act or negligence in failing and refusing to contribute to the support of the government which affords protection to that property and to his person. Lands forfeited to the State may be sold by it or the former owner may be permitted by it to redeem them. The State need not, if it sees fit, extend such grace or privilege. But this grace or privilege of redemption has been extended by our state to the former owner, yet with a limitation. It does not pertain to lands that have been already sold as forfeited nor to lands which have been transferred to or vested in another pursuant to the constitution and laws. The former owner must consummate his redemption before these things take place; otherwise, the privilege of redemption is denied him. Sales by the State, or transfers under the constitution and laws, produce a revenue for the support of the government. Settlement and residence by *bona fide* citizens are also encouraged by such sales and transfers.

Now, should King be extended the privilege of redeeming the Pomeroy land? For the present, we may resolve the case to this simple question. In extending the grace or privilege of redemption, the Legislature expressly limited it, and provided in that connection that "such redemption shall in no wise affect or impair any right, title or interest any other person may have in said real estate or any part thereof, *by purchase from the State,* or under and by virtue of section three of article thirteen of the Constitution of this State." Code, chapter 105 section 17. In *State* v. *Jackson,* 56 W. Va. 559, it is held: "When land has been once sold as forfeited under a proceeding under chapter 105 of the Code to sell forfeited land, the State cannot, in a later proceeding under that chapter, again sell the same land as forfeited under another title. The record of the first sale is an estoppel against the State, preventing such second sale." This aptly applies here if the 20,000 acres since the forfeiture of King's title in 1888 have been sold as forfeited under another title. The first sale is an estoppel against the State. Redemption depends upon the State's right to sell. If there can be no sale, there can be no redemption; and if there has been a sale even under some other title forfeited, there can be no redemption. The State can make only one sale under such forfeiture. Having once been sold as forfeited, the land cannot again be sold at the instance of the State until it is again forfeited as to the title created by the prior sale. Code, chapter 105, section 6, is directly to this effect. It provides: "Any tract or parcel of land which has been heretofore forfeited or treated as forfeited, waste and unappropriated or escheated to the state of Virginia or this state, and which has been sold and conveyed as such under decree or order of the circuit court in any suit or proceeding under chapter one hundred and five of the code or other act at any time since eighteen hundred and seventy two, or which any instrument executed under such decree or order purports to convey, shall not again be proceeded against or sold in any suit or proceeding now pending or hereafter brought under said chapter or otherwise, unless since the execution of such conveyance or instrument such tract or parcel of land has become forfeited

for the non-payment of taxes charged or chargeable thereon, since such conveyance or instrument, in the name of the purchaser thereof, his heirs, devisees or assigns." Nor can redemption be permitted after a sale of a tract of land by the State until there is a forfeiture of the title so sold. Section 6 further provides: "No circuit court shall have jurisdiction, power or authority to sell any such tract or parcel of land or to permit any such tract or parcel to be redeemed by any party in any suit or proceeding now pending or hereafter brought under chapter one hundred and five of the code aforesaid, or otherwise, against any other grant, survey, piece or boundary of land which has been or may be forfeited or claimed to be forfeited and which may be claimed to embrace such tract or parcel within its bounds and as part thereof, unless the state alleges and proves by a certificate of the auditor of the state, or of the clerk of the county court of the county where such tract or parcel of land or the greater part thereof lies, that such tract or parcel of land has since the date of such conveyance or instrument become and remains forfeited to the state in the name of such purchaser, his heirs, devisees or assigns, or unlesss some other claimant of such land shall within the time aforesaid by answer or petition filed for the purpose make such allegation and file such proof." And the Legislature did not stop here. It made this denial of the privilege of redemption imperative, by further providing in that section: "In the absence of such allegation and proof the circuit court shall have no jurisdiction either to sell such tract or parcel of land, or to allow the same to be redeemed by any party in such suit or proceeding now pending or hereafter brought under chapter one hundred and five aforesaid, or otherwise, against any other grant, survey, piece or boundary of land which may be claimed by any party to such suit to embrace such tract or parcel, after the filing in such suit of such conveyance or instrument made to such purchaser, his heirs, devisees or assigns, or a certified copy from the record thereof. After the filing in such suit of such conveyance or instrument or certified copy the court, in the absence of such allegation and proof by the state made and filed within thirty days thereafter, shall thereupon enter an order dismissing

the suit as to any such tract or parcel of land and proceed no further against the same.'' This is the law of the State. If it applies here, we must enforce it. It is ours to declare, not to make, the law. Now that King asks to redeem the 20,000 acres as a part of the 500,000 acre grant, we must inquire as to whether or not the State has sold those 20,000 acres. If it has, as alleged, and there is not a new forfeiture of the title so sold, that it is a complete denial of the extension of the privilege of redemption to him, and we need to consider no other question arising in the case. As we have stated, clear and certain is it that the 20,000 acres forfeited to the State in the name of Mrs. Pomeroy and in the names of some of her predecessors in title were sold to Stoddard and Hall by a proceeding instituted and carried on in the name of the State through Hinchman, Commissioner of School Lands. There can be no question as to this. That proceeding was a suit under chapter 105 of the Code. The court directed Hinchman to make sale of this identical land which it ascertained to belong to the State. He did sell to Stoddard and Hall; and through them Buskirk now owns the land. But it is said that Mrs. Pomeroy had no title. That may be. It matters not. The Legislature has not made former absolute title in the one as to whom it is sold as forfeited requisite to such sale's being the only one that can be made. Mrs. Pomeroy had color and claim of title which became forfeited. At any rate, the State had title by the King forfeiture in 1888. And by this King forfeiture it had title to sell if it had none by the Pomeroy forfeiture. What matters the denomination of an erroneous source of title in one's contract of sale if he in fact has title from some proper source? Under whatever name the State sells, it passes title to the land if the State has title from any source. But it is said that the Wilkinson deed is irregular, or that it conveys other land. Be that as it may, our law does not say that only lands regularly deeded by the State or on behalf of the State are barred from the privilege of redemption, but it does distinctly provide that redemption shall not apply to lands held *''by purchase from the State.''* Chapter 105, sections 17 and 20. So we say it is clear to us that the State made sale of the 20,000 acres in question to Stoddard and Hall at a time when it had

title by the King forfeiture at least, that by that sale the State is estopped and that it cannot extend to King the privilege of redeeming these 20,000 acres or such part as may lie within the bounds of his grant, if there has been no subsequent forfeiture.

King insists that since the Wyoming suit was pending when the Hinchman suit was instituted and since he was not a party to the latter, the purchase by Stoddard and Hall cannot affect his rights to redeem. But he has no vested right to redeem. So we have held. JUDGE BRANNON elucidates this subject, in the opinion filed by him. Under the law, as stated hereinbefore, he shall not be granted the privilege of redemption after the State has held out the land and invited a purchaser therefor, which purchaser has fully complied with the State's offer. To permit redemption under such circumstances would tend to unsettle and not to settle such titles; it would tend to discourage rather than to encourage the payment of taxes and the support of the government. In view of our statutory law we cannot believe that the State was wholly forbidden to institute the Hinchman suit while the Wyoming suit was pending and to sell the land thereby, since that suit was based upon the forfeited Pomeroy and Irwin title, even though we must say that the sale therein carried to the purchaser the title the State had acquired by the King forfeiture. Nor need we determine whether it was absolutely necessary to make King a formal and direct party to that proceeding. However this may be, it clearly appears that King had knowledge of that suit, and could have intervened by a prayer to redeem in ample time before the sale to Stoddard and Hall. The time he should have spent in preparing and filing a petition to redeem and depositing with it the money for such redemption, he spent in undertaking to enjoin the sale, by process from the Federal Court. He did not ask to redeem, as the law permitted him to do. He seems to have bent upon obstruction of the State in producing a revenue from forfeited titles and not in the payment of money for redemption of his forfeited title.

But granted that there was irregularity in the sale to Stoddard and Hall, either by reason of the Wilkinson deed, the lack of deed if there is none, or the absence of

King as a party from the Hinchman suit, the sale to Stod-dard and Hall was validated by section 19, chapter 105, of the Code, its very self a legislative grant. The language of that enactment, that legislative grant of this land to Stoddard and Hall or their successors, is: "Whatever right, title, interest and estate the State of West Virginia had to any lands at the date of the sale or conveyance thereof, or instrument purporting to convey the same heretofore made by said state through and by the commissioner of school lands of any county, under an order or decree of the circuit court in any suit or proceeding under said chapter one hundred and five of the Code, however derived or claimed, shall be deemed and held to have passed to and vested in the grantee thereof, whether the land so sold was proceeded against as forfeited, escheated, or as waste and unappropriated land, notwithstanding any irregularity or error in such proceeding or informality in such sale." The Legislature has full power to dispose of the State's property. In pursuance of a well-meant policy, it saw fit by the enactment aforesaid to validate the sale to Stoddard and Hall if it was not before valid, and to vest "whatever right, title, interest and estate the State of West Virginia had" to the 20,000 acres at the date of the sale thereof. If it was only King's forfeited title that the State had at the date of this sale, that act vested it in Stoddard and Hall, or their successors. We can do nothing but to give effect to this plain legislative grant. It is not unlike the old legislative grant to Dumas, trustee of the Swan lands, which is the very saving of King's claim of title to the Morris grant. Not content with the words aforesaid, the Legislature is more emphatic in these words: "And all such sales and conveyances and purported conveyances are hereby confirmed and made good and valid." Thereby has been confirmed and validated the Stoddard and Hall title, now owned by Buskirk. The State had the power to give them the land, and deny King the grace of redemption. It did so, by this act, if Stoddard and Hall did not have good title by their purchase aforesaid.

. But has the title of Stoddard and Hall, or their successors, become forfeited to or vested in the State since the purchase aforesaid? If it has, and the State again owns the land, shall

King be permitted to redeem, regardless of the new title created by that sale to Stoddard and Hall? The taxes on the Stoddard and Hall title have been paid. However, it appears from a certificate of the Auditor that, for a certain delinquency, this title was sold to the State, and then not redeemed at the Auditor's office until two days after the expiration of one year. King insists that, by reason of the failure to pay these delinquent taxes within the year after said sale to the State, the title became completely vested in the State, and that it is still there. Thus, he says, the State, having title, should allow him to redeem. It seems that it did so vest. The title could not be redeemed by a mere payment on the date certified as aforesaid. But we cannot say that the title is still in the State. We hold that Buskirk, having acquired King's forfeited title, by purchase from the State, and legislative validation and confirmation of the title so purchased, had right superior to that of King to redeem. The state created a new title which it will honor first in the matter of redemption. Buskirk, therefore, was entitled to redeem in preference to King. And, in effect, his motion to dismiss the land from the suit was sufficient in this particular. The redemption money having long ago been paid, and there being only a technical failure to redeem, the State did not resist his motion. It had its taxes and was content. The decree of dismissal of the land operates as a substantial and complete redemption by Buskirk. King cannot complain, because his right was inferior. The court recognized the proper party.

It is contended on behalf of Buskirk that the forfeited title of King became vested in or transferred to him by virtue of the force of section 3, Article XIII, of the Constitution of West Virginia. But why discuss this feature of the case, since we have held that whatever title the State had by reason of the King forfeiture at the date of the sale to Stoddard and Hall was passed to and vested in the Stoddard and Hall title by a plain legislative grant, to-wit: that transferring and validating act in section 19, chapter 105, of the Code? This act, by its very terms, gave to Stoddard and Hall and their successors "whatever right, title, interest and estate" the State had in the lands at the date of the

sale in the proceedings wherein they became purchasers, "however derived or claimed." King's title was forfeited at that time to the State. It had a title "derived" by that forfeiture. This act passed that title to the owners of the Stoddard and Hall title. This being true, it is useless to discuss a view of the case that the title was passed or transferred in some other way. The grant by the legislative enactment aforesaid and the validation and confirmation of the Stoddard and Hall title thereby, together with the plain mandate of the law that property once sold by the State shall not be redeemed, fully justified the dismissal of the Buskirk land from the suit, as was done by the decree of which King complains by this appeal. We therefore affirm that decree. Of course, this affirmance of the decree is as it has been modified and corrected by order heretofore entered in this Court, releasing therefrom a certain boundary which it was admitted the court below included by inadvertance.

In the briefs of counsel upon this appeal, many matters have been brought to our attention. Much argument upon points of inconsequence as well as of consequence has been presented. Counsel for each party have evidently spared no pains in presenting the case. But in every case there are prominent facts and principles which completely control—features standing forth so convincingly as to outweigh matters of minor importance, which in themselves may seem to the contrary, and thus controlling judgment to a right conclusion upon the whole. It is so here. Therefore, we have noticed in this opinion only that which convincingly controls the case and has weight and substance when considered with our law and its reason and purpose. The conclusion to which we come in this opinion we believe to be founded upon a proper application of the law to such case as is here presented. Of course, if our forfeiture system is invalid and the statutes in furtherance of it are inoperative, we are wrong in our judgment herein pronounced. But this system has received the sanction of the courts for years. We cannot believe the charge of invalidity by which it is characterized in the briefs of appellant. It must remain for another tribunal to overthrow it, if that ingenious argument is to prevail. It is too sacred, too

far-reaching by years of operation, and has had too long full
recognition by this and other courts · and approval by the
people to be overthrown by us.   It is particularly suited to
the realm of this commonwealth, has been beneficial to its
development and welfare, and was the only practical solution
of a state of chaos in land titles that came to us from
Virginia's disregard of the valuable territory west of the
Alleghenies.   None but neglectful or unpatriotic taxpayers
can complain of its operation.   Its overthrow would be
fruitful·only to such, but it would at the same time wreak
devastation upon the deserving and innocent.

*Affirmed.*