# CHARLESTON.

STATE v. CENTRAL POCAHONTAS COAL CO. *et al.*

Submitted January 21, 1919.  Decided January 28, 1919.

1. TAXATION—*Tax Sale—Returns and Record—Validity.*

    Under the law as it stood in 1875 a sale of land by the sheriff for the non payment of. the taxes thereon is void where the record does not show that the sheriff returned his report of such sale within ten days thereafter.  (p. 237).

2. ESTOPPEL—*Taxation—Conveyance of Forfeited Land—Title of Grantee.*

    A deed made by the commissioner of school lands under the provisions of the Act of 1872-3, in regard to the sale of forfeited, waste and unappropriated land, is a grant from the state. Such deed vests in the grantee therein all of the title possessed by the state, and in case the state subsequently acquires an adverse title by forfeiture or otherwise, it will be estopped to assert the same against its grantee in such school commissioner's deed.  (p. 237).

3. TAXATION—*Decree of Redemption—Effect.*

    A decree of redemption in a suit to sell forfeited lands for the benefit of the school fund, brought under the provisions of chapter 105 of the Code, is in effect a grant by the state of the land redeemed to the party redeeming the same.  (p. 240).

4. SAME—*Sale of Forfeited Lands—Adverse Possession.*

    One who has been in possession of land for more than ten years under a decree of redemption entered in a suit brought to sell such land as forfeited under the provisions of chapter 105 of the Code, and has paid the taxes regularly assessed against such land during such time, becomes vested with the title of an adverse claimant to such land under the provisions of § 3, Art. 13, of the Constitution, when the same is purchased by the state for the non payment of the taxes assessed against the same in the name of such adverse claimant, and is not redeemed within one year after such purchase as provided by law.  (p. 240).

5. EQUITY—*Amended and Supplemental Answer—Allowance.*

    It is not error to allow a defendant to file an amended and supplemental answer, where the matter set up therein is of such character that it is necessary that the same should be before the court for a proper determination of the matters involved in the suit, and is not contradictory of the matter alleged in the original answer.  (p. 242).

6.  TAXATION—*Assessment Against Joint Owners—Redemption.*

Where a tract of land is assessed upon the land books in the name of the joint owners as a whole, a payment by one of the joint owners of a portion of the taxes corresponding with his interest in the land will not redeem such interest from the delinquency, and a purchase by the state of such land at a sale of the same for such delinquent taxes will vest the title to the whole thereof in the state upon a failure of the former owners to redeem the same within one year, even though the sheriff advertises for sale and purports to sell only an undivided interest.  (p. 242).

Appeal from Circuit Court, Cabell County.

Suit by the State of West Virginia against the Central Pocahontas Coal Company, Lewis B. Cook and others. Decree for defendant Central Pocahontas Coal Company, and defendants Lewis B. Cook and others appeal.

*Affirmed.*

*A. D. Preston, Wm. R. Thompson, M. P. Howard* and *Brown, Jackson & Knight,* for appellants.

*E. T. England,* Attorney General, for the State.

*Anderson, Strother, Hughes & Curd* and *Price, Smith, Spilman & Clay,* for appellees Central Pocahontas Coal Co. and others.

RITZ, JUDGE:

This suit was instituted for the purpose of having sale of a tract of 905 acres of land for the benefit of the school fund. There are two sets of claimants to this land, to-wit, the Central Pocahontas Coal Company, claiming it under a deed from John V. Bouvier and others; and A. D. Preston and others, claiming it under a title derived from the commissioner of school lands of Wyoming county. This tract of 905 acres is a part of a larger grant of 480,000 acres made by the Commonwealth of Virginia in the year 1795 to Robert Morris. This 480,000-acre grant, together with another grant of 320,000 acres lying adjacent thereto, passed in the year 1852 under various deeds to Michael Bouvier, with the exception of 50,000 acres which had been theretofore conveyed away. Several people were interested with Michael Bouvier, and under an agreement among them the land re-

maining, after excluding the 50,000 acres which had there-
tofore been sold, was surveyed, and it was found that in-
stead of there remaining 750,000 acres of the two surveys,
there was only 157,500 acres thereof. This was divided into
tracts, one of which was to be conveyed to each of the inter-
ested parties, upon the payment of certain sums specified
in the contract. Accordingly Bouvier conveyed two of said
tracts, to-wit, 63,000 acres and 17,850 acres to John Herman
in the year 1853; a 15,750-acre tract he conveyed to Oakes
Terrill, Jr.; and another 15,750-acre tract to Richard War-
ren. Both of these conveyances were made in the year
1853. This left remaining a tract of 36,750 acres, which was
to be conveyed to Eustache Bouvier, and a tract of 8400
acres which was to be conveyed to William A. Bull, upon
the performance by these parties of the conditions of the
contract referred to. The 36,750-acre tract was in 1865 con-
veyed to Jonathan Patterson through an arrangement with
Eustache Bouvier, which it is not now necessary to advert
to, leaving title to 8400 acres remaining in Michael Bouvier.
The tract of land in question is a part of this 8400 acres.
Michael Bouvier retained this tract of land until his death
in 1874, when it passed to his devisees under his will. It
appears that for the years 1869 to 1876 inclusive this tract
of land was returned delinquent for the non payment of
the taxes thereon, and was offered for sale by the sheriff
for such delinquent taxes, and purchased by the state at
each of said sales. From 1877 until 1890 the tract of land
was not on the land books in the name of Bouvier or his de-
visees, and in the year 1890 the commissioner of school
lands of McDowell county, in which county the larger part
of the land lay, filed a bill asking to have sale thereof for
the benefit of the school fund as forfeited for non entry
upon the land books for more than five years. In that pro-
ceeding Bouvier's executors filed a petition asserting title
to the tract of land, and asking leave to redeem the same
from the forfeiture. This leave was granted and it was re-
deemed, the taxes in arrears paid thereon, and the same re-
entered upon the land books of McDowell county. At that
time and for sometime thereafter it was believed that this
tract of land lay entirely in the county of McDowell, when

in fact part thereof, to-wit, a little over 900 acres lay in the county of Wyoming. After this redemption in 1890 the land was regularly charged on the land books of McDowell county, and the taxes regularly paid thereon until the year 1908. In that year it was discovered that part of the tract lay in Wyoming county, to-wit, 953 acres thereof. Upon discovering this fact this 953 acres was entered upon the land books of Wyoming county, and the taxes thereon duly paid for the year 1908 and each subsequent year by the Bouviers and those claiming under them, and the McDowell tract reduced in area by a like amount. A part of this 8400 acres embracing the land in controversy in this suit was conveyed by the Bouviers to the defendant Central Pocahontas Coal Company, by deed of October 2, 1914.

The defendant Preston and his associates claim under a deed from the commissioner of school lands of Wyoming county made in the year 1887. It appears that in the year 1866 a deed purports to have been executed by Michael Bouvier to Henry L. Morris conveying the 480,000-acre grant and the 320,000-acre grant made to Robert Morris in 1795. This deed was placed on record in Tazewell county, Virginia, in the year 1875. A deed purporting to be executed by Henry L. Morris dated in the year 1875 to Morgan H. Haskins, and conveying the same land, also was recorded in Tazewell county, Virginia. In the year 1879 these two deeds, or authenticated copies, were recorded in Wyoming county, West Virginia. The deed from Michael Bouvier to Henry L. Morris was a forgery, and as soon as it became known to the real owners of the land it was attacked, and, in several suits brought for the purpose, has been adjudicated to be a forgery. The 480,000-acre grant under this forged title was conveyed to Jesse R. Irwin. The taxes were not paid upon the tract of land under the Irwin title, and in the year 1881 the commissioner of school lands of Wyoming county instituted a suit for the purpose of having sale of the 480,000-acre tract as forfeited to the State of West Virginia for the benefit of the school fund. The land was decreed to be sold in this proceeding, and was offered for sale, but it appears that the first sale reported was not con-

firmed by the court, for the reason that the price was inadequate, and the court thereupon directed the commissioner of school lands to have the tract sub-divided into 640-acre parcels, and to again offer the same for sale. In accordance with this direction some fifty or more tracts were laid off, and when they were offered for sale they were largely purchased by John W. McCreery and L. B. Cook. At any rate, the sub-divisions which it is contended include the tract of land in controversy in this suit were purchased by Mc-Creery and Cook. In 1887 deeds were made to the said Cook and McCreery conveying the tracts of land so purchased by them, including the parcels which it is claimed cover the land involved here. In addition to including the land involved in this case the purchases made by Cook and Mc-Creery included a large part, if not all, of the 36,750-acre tract conveyed by Bouvier to Patterson, as above stated. Upon the discovery of this fact Patterson's successors in title, to-wit, Francis Lasher and others, trustees, instituted a suit for the purpose of cancelling the school land commissioner's deed as a cloud upon the Lasher title. In this suit the school land commissioner's deed was cancelled and held to convey no title, because of the fact that the tract of land purported to have been sold by the State of West Virginia for the failure of Jesse R. Irwin to pay the taxes had no existence; that the deeds under which Irwin held were forgeries and no title passed thereby. Preston and his associates, however, claim that this adjudication only affected the rights of McCreery and Cook so far as the deed to them covered the Lasher land. They claim that they have ascertained that this tract of 905 acres is not part of the Lasher tract, and is within the 8400-acre tract. With this view they had placed upon the land books of Wyoming county a tract of 905 acres which it is claimed by them was conveyed to Cook and Mc-Creery by the commissioner of school lands in the year 1887, being the residue of the land contained in that conveyance excluding the part thereof covered by the Lasher deeds. In the year 1910 they failed to pay the taxes upon this tract of land charged in their names, and the same was returned delinquent for the non-payment of these taxes and sold by

the sheriff of Wyoming county, and purchased by the State. It was not redeemed within one year, in which the former owner had a right to redeem before the title became vested in the State, and this suit was thereupon brought by the commissioner of school lands to subject the same to sale for the benefit of the school fund.

The defendant Central Pocahontas Coal Company claims that the defendants Preston and others have not now and never did have any title or interest in this tract of land. They claim, first, that no title ever became vested in Jesse R. Irwin under the forged deed from Bouvier to Morris; second, that no title became vested in Cook and McCreery by the deed from the commissioner of school lands in the year 1887; and third, that even though Cook and McCreery did get title under the deed of 1887, this title became vested in the Bouviers under the provisions of the Constitution as soon as it became vested in the state for the failure to pay the taxes in 1910. It is earnestly insisted by Preston and his associates that the Bouvier land was forfeited and the title thereto vested in the state in the year 1881 at the time of the institution of the suit by McClure, commissioner of school lands, for the purpose of having sale of the 480,000-acre Morris grant, and that when the sale was made by the commissioner of school lands the purchaser acquired all of the title of the State of West Virginia in the lands covered by the deeds made by said commissioner, whether the same was acquired by the state through the Irwin title, or from any other source, and that because this 905 acres of the Bouvier 480,000-acre tract was included in the deed made by the commissioner of school lands to Cook and McCreery, the title thereto being at the time forfeited and vested in the state, it passed to and became vested in Cook and McCreery under that deed.

On the other hand, it is contended that in the year 1881, at the time of the institution of the suit by the commissioner of school lands of Wyoming county, the Bouvier title had not been forfeited. It is admitted that this land was returned delinquent for the non-payment of taxes for the years 1869 to 1876 inclusive, and that it was sold by the

sheriff for those years and purchased by the state, but the contention is that those sales and each of them were absolutely void and passed no title to the State of West Virginia. It is admitted that this land was off the land books thereafter until the year 1890, when it was redeemed by the Bouviers, the back taxes paid, and the tract placed upon the land books in McDowell county where it was then believed the whole tract lay, and that subsequently, in 1908, upon discovering that 953 acres was in Wyoming county, that amount was entered upon the land books of Wyoming county. But it is said that the fact that this land was off the land books after the year 1876 had not the effect of forfeiting the title thereto and vesting the same in the state in the year 1881, when the school land suit was brought, for the reason that it was on the land books in the name of Irwin and his associates for part of that time, and that notwithstanding the Irwin title was a forgery, if the land was charged on the land books in the name of Irwin it would prevent the title thereto from becoming forfeited and vesting in the state, inasmuch as Irwin purported to claim under the same title as Bouvier; and it may be said further that in the year 1881, at the time of the institution of the school land proceeding, the land had not been off the land books in the name of Bouvier for five years. The defendant Central Pocahontas Coal Company contends that this was the true status of the Bouvier title in 1881, and that the State of West Virginia, at the time of the institution of that proceeding had no right, title or interest, of any character, in the tract of land now sought to be sold, for the reason that the Irwin title was a forgery, and no rights could be acquired thereunder, and the Bouvier title had not at that time become forfeited for non entry for as much as five years, and the sales made thereof by the sheriff were void and of no effect, and this being true the circuit court of Wyoming county was entirely without jurisdiction to entertain a suit to sell the tract of land, and any proceedings had by it were *coram non judice.* The contention is further made, however, that even though the Bouvier title was forfeited and vested in the state in the year 1881, and the deed from Mc-

Clure, commissioner, to Cook and McCreery, made in 1887, did have the effect to vest in Cook and McCreery the state's title to so much of the Bouvier tract as was included in that deed, still Preston and his associates are not entitled to redeem the land in this proceeding, for the reason that the deed from McClure, commissioner, to Cook and McCreery was a grant from the State of West Virginia, and should be treated as such; that the decree of redemption made by the Bouviers in 1890 was likewise a grant from the State of West Virginia for their tract of land, and that the parties stood in the position of holding conflicting titles to the same tract of land, so far as the McClure deed included any part of the Bouvier land. Of course the Cook and McCreery deed was the senior grant and was superior, and their title would be good unless they lost the same in some of the ways provided by law, and the Central Pocahontas Coal Company contends that this is just what they did. It is shown, and not attempted to be contradicted, that the Bouviers and those claiming under them had possession of the 8400-acre tract for a long time, much more than ten years, before the return of delinquency of the Cook and McCreery tract for the taxes in 1910, and that while it may be that this possession was not in Wyoming county, and was not within the interlock, still this being a contest between the state and the Bouvier interests, it is not material upon what part of the tract the Bouviers had possession, just so that it was upon the tract granted to them by the state under the redemption proceeding, and their contention is that the very minute the title of Cook and McCreery vested in the state by reason of the return of delinquency for the taxes of 1910, and the sale and purchase thereof by the state under that delinquency, this title became transferred to them under the provisions of the Constitution.

Did the state have any title to the land in controversy at the time of the institution of the proceeding against the 480,000-acre tract in Wyoming county in 1881? Of course, the forfeiture of the Jesse R. Irwin forged title conferred no title upon the state, and if the Bouvier title was not at that time forfeited, then the state did not have any title at

.that time. If the sales made by the sheriff of McDowell county -of the Bouvier tract for non payment of taxes for the years 1869 to 1876 inclusive were void, and the state acquired no title thereunder, and this title was not forfeited for non entry upon the land books for more than five years, then the same was not vested in the state at that time. The contention is made that the sales made by the sheriff for the years 1869 to 1876 inclusive are void, for the reason that it does not appear that the sale list was returned to the clerk's office within ten days after the sales were made. Certificates of the clerk are filed in the record in this case showing that it does not appear when these sale lists were returned to the clerk's office, and as held in *State* v. *Harman*, 57 W. Va. 447, as the law stood then, a sale was void where the record did not show that the sale list was returned to the office of the clerk within ten days, and the date of such return noted thereon. We are, therefore, constrained to hold that no title vested in the State of West Virginia by reason of the sales made by the sheriff for the delinquencies for the years 1869 to 1876 inclusive. Was the Bouvier title forfeited to the state in 1881 for non entry upon the land books for more than five years? This tract of land was charged on the land books in the year 1876, and it is quite patent that in 1881, at the time of the institution of the school land proceeding by McClure, commissioner, five years had not yet elapsed, and there could have been no forfeiture or vesting of the title in the state in 1881 for that reason. The proceeding was instituted by McClure in the fifth year, and not after the five years had expired. The forfeiture does not become complete, and the title does not vest in the state unless the land remains off the land books for five years. The state has no more title at any time during the five-year period than it would have if the land had been regularly kept on the land books and the taxes paid thereon. But the defendant Central Pocahontas Coal Company contends that even though the Bouvier land was not on the land books for more than five years, the fact that the Morris tract, including the land in controversy in this suit, was charged on the land books in the name of Irwin and his

associates· for some of these five years would prevent a for-
feiture to the state, even though the Irwin˙ title ·was void
because based upon a forgery, and this seems to be the law.
*Kelley* v. *Dearman,* 65 W. Va. 49; *Chilton* v. *White;* 72 W.
Va. 545. But does the fact that the state had no title to any
part of the land in 1881, when the proceeding to sell the
same was begun, make any difference? It is admitted that
the Bouvier title was forfeited and vested in the state in
1887 when the deed from the commissioner of school lands
to˙ Cook and McCreery was actually made. It must be borne
in mind˙that this proceeding was brought under the Acts of
1872-3, and that the same was a purely administrative pro-
˙ceeding, and not in any sense judicial. *McClure* v. *Mait-
land,* 24 W. Va. 561. It was the method adopted by the
state of divesting itself of the title to land which came to it
by forfeiture or by purchase for delinquent taxes. The leg-
˙islature could have as well ˙conferred the authority to make
these grants upon any other officer as upon the commis-
sioner of school lands. There were certain preliminary in-
quiries to be made in order that the officer upon whom the
duty of making the conveyance devolved might be fully in-
formed of the real condition of the title, but these inquiries
were in no sense judicial. The former owner˙ of the land had
no interest therein; he had no right to be a party to the
suit. It is true the state permitted him to redeem the same,
˙or in effect become the purchaser for the amount of taxes
˙in default, but this was not a right given to him under the
law as it then was, but simply a chance that‿he had to take
advantage of if he would get the benefit of it. If he re-
deemed the land before the state sold it he got his title back,
but if the state sold it without his knowledge before he re-
deemed it, his title was gone. This being the nature of the
proceeding by which the commissioner of school lands con-
veyed to Cook and McCreery, it would seem that any title
vested in the state at the time the grant was made in 1887
would pass thereby. It is in no wise different from a case
in which the state would make a second grant of land which
it had theretofore granted. Any part of the first grant, the
title to which should become vested in the state by forfeit-

ure or otherwise, would pass to the grantee in the second grant. Further than this, even though the state's title was not good at the time of the grant, and conceding that the grant must be construed as taking effect at the time the proceeding was instituted for that purpose, the deed made by the commissioner of school lands would, under the contention of the defendant Central Pocahontas Coal Company, convey no title as a matter of fact, but the state could not say this. The state offered the land for sale. This offer to sell pre-supposes title thereto in the state, and after it has received the purchase money and made a deed therefor to the purchaser it cannot be heard to dispute that title, and any title subsequently coming to the state by forfeiture or otherwise from a source other than the grantee in the deed, would inure to the benefit of such grantee. It is the application of the same doctrine that is enforced in the case of a transaction between individuals. If one make a deed to real estate to which he has no title, and subsequently acquires title thereto, he will be estopped from claiming said real estate against his grantor, and so the state in a proceeding like this, even though it had no title at the time of the conveyance, would be estopped to set up a subsequently acquired title against its own grantor. *State* v. *King,* 64 W. Va. 610. It follows from this conclusion that when the Bouvier title became forfeited, as it did a short time after the year 1881, it passed to the grantees of the state in the Cook and McCreery deed, or at any rate the state in this proceeding cannot claim that Cook and McCreary did not own this land.

But does this conclusion help Preston and his associates in this case? In 1890 confessedly the Bouvier title was forfeited, and so much of this Bouvier land as was acquired by the deed from McClure, Commissioner, became vested in Cook and McCreery by reason of that deed, so that at the time of redemption by the Bouviers it may be said that the Bouvier title to the 905 acres here involved was vested in Cook and McCreery, at least insofar as the State of West Virginia was concerned. What was the effect, however, of the redemption by the Bouviers in 1890 in the suit brought

by the commissioner of school lands to sell the Bouvier land
as forfeited? The Bouviers in that proceeding claimed to
own the 8400 acres of land. The court decreed that they
were entitled to redeem the same, and they did pay all the
taxes found to be due the state thereon, and have paid the
taxes assessed against the same ever since. Under the hold-
ing of this Court in the case of *State* v. *Jackson*, 56 W. Va.
558, such a redemption was a grant of the land from the
state; it was the same in effect as though a grant had been
made by the state to the party redeeming. So that, even
under the contention made by Preston and his associates,
they had a grant from the state by reason of the deed from
McClure, commissioner, in 1887, which covered the 905-acre
tract involved in this suit. The Bouviers had a junior grant
from the state covering the very same land. It must be
borne in mind in this case that the contest here is between
the grantee of the Bouviers and the state, and is not between
Preston and the Bouviers. The state is here asserting the
right to sell this tract of land, claiming that the title is vested
in it. The Bouviers are contending upon the other hand
that the state cannot sell this land because it granted the
same to them in 1890, and has collected the taxes thereon from
them ever since. They claim and show that they have been
in possession of the 8400-acre tract for much more than ten
years prior to the return of delinquency of the Cook and
McCreery title, and their contention is that just as soon
as the Cook and McCreery title became vested in the state
by reason of their failure to pay taxes, the sale thereof by the
sheriff, and the purchase thereof by the state, it was im-
mediately transferred to and vested in the Bouvier inter-
ests by virtue of the constitutional provisions contained in
§ 3 of article 13. The fact that the possession of the Bou-
viers is not clearly shown to be upon the tract of land now in
controversy, being only a part of the grant to them by the
state in 1890, can make no difference. Their possession
within the bounds of the 8400-acre tract is undisputed. As
before stated, their controversy is with the State of West
Virginia. They say to the State, you have granted us this
8400-acre tract of land, and by the Constitution it is pro-
vided that if we will go upon it and take possession of it

and pay the taxes thereon, any subsequent title which may become vested in you will immediately upon the vesting thereof become transferred to us. We think it quite clear, therefore, that even though Cook and McCreery acquired title to this land under the deed of 1887 from McClure, Commissioner, the minute that title became vested in the State of West Virginia it was transferred to and became the title of the Bouvier interests.

After the issue was made up in this case by the filing of the answers of the defendants, and after the commissioner had reported on the matters involved, the defendant Central Pocahontas Coal Company was permitted to file an amended answer, in which was set up the invalidity of the tax sales made by the sheriff of McDowell county of the Bouvier lands for the years 1869 to 1876 inclusive, and in which was also set up the fact that the 480,000-acre grant to Robert Morris was on the land books for some of the years between 1876 to 1881 under the Irwin forged title. The appellants objected to the filing of this answer, and they assign the action of the court in permitting it to be filed as ground for reversing the decree. It is quite true that the matter set up in this answer existed at the time the original answer was filed, but the defendant avers that it was not advised thereof, and that it came into the possession of the information since the filing of its original answer. As to when a defendant in an equity suit will be permitted to file an amended answer is largely discretionary with the trial court. If it appears that the matter set up in the amended answer is such as should be presented to the court in order for a full hearing and determination of the rights of the parties, and is not contradictory of the matter set up in the original answer, ordinarily permission will be granted to file such an amended answer. Story's Equity Pleadings, § 902. While it may be true that the defendant did not know these facts at the time it filed its original answer, it is clearly true that it might have known them by an investigation of the records, but still it seems that where the matter set up in the amended answer is such as the court should have before it in order for a fair determination of the controversy, such amendment will be allowed. We do not think the court

abused its discretion in this case in permitting the amended answer to be filed. If the parties adversely interested desire an extension of time in order to meet the new matter set up in the amended answer, ordinarily it should be granted them. In this case no such time was granted, nor was it asked, and it was not error for the court to proceed with the hearing of the cause without granting time to meet the new matter set up in the answer when such time was not asked by any party adversely affected thereby.

Preston and his associates now contend that the sale made by the sheriff for the taxes of 1910, at which the state became the purchaser, was void for the reason that the sheriff only purported to advertise a seven-eighths interest in the tract of land, and returned only a seven-eighths interest therein. The whole tract of land was assessed on the land books in the name of Preston and his associates for the year 1910. One of the joint owners paid one-eighth of the taxes, he claiming to own a one-eighth interest in the land, and the sheriff then advertised for sale a seven-eighths interest in the land, and returned as sold to the state a seven-eighths interest therein. Under our decisions in the cases of *Toothman* v. *Courtney*, 62 W. Va. 167, and *Caretta Railway Co.* v. *Fisher*, 74 W. Va. 115, an undivided interest in a tract of land cannot be placed upon the land books and assessed for taxes, for the reason that the lien of the state for taxes goes to the whole of the tract and to every part thereof, and it was held in those cases that such an assessment was void, and that a deed based thereon was likewise void. That is not the case here, however. The assessment was of the whole tract of land, and the irregularity was in the advertisement for sale and the sheriff's return of the sale. Undoubtedly under the decisions above cited the state's lien for taxes existed on every part of this tract of land, even after the payment of one-eighth of the taxes by one of the interested parties. That only reduced the amount which the state was entitled to collect, and did not in any wise affect the security or change the lien existing thereon, and when this land was sold in satisfaction of this lien and purchased by the state, the state purchased all of the land upon which the lien ex-

isted.    The irregularities existing in the advertisement and
in the return of the sheriff did not affect the validity of this
sale.    Section 32 of ch. 31 of the Code provides that all of
the title of the former owner shall vest in the state upon a
purchase by it at a tax sale without a deed therefor, giving
to such a purchase the same effect as a purchase under a
conveyance by deed would have were the land purchased by
an individual, and the curative provisions of § 25 of ch. 31
apply to sales made to the state.    *State* v. *McEldowney*,
54 W. Va. 695.    That section provides that all such title and
interest as was vested in the person or persons charged with
the taxes thereon for which it was sold, at the commence-
ment of or at any time during the year or years for which
said taxes were assessed, shall be transferred to the pur-
chaser, in this instance the state, notwithstanding any irreg-
ularity in the proceedings under which the same was sold,
unless such irregularity appear on the face of such proceed-
ings of record in the clerk's office, and be such as to ma-
terially prejudice and mislead the owner as to the portion
of his real estate sold, and when and for what year sold, or
the name of the purchaser, and not then unless it be clearly
shown that but for such irregularity the former owner of
the real estate would have redeemed the same.    The irregu-
larity here appeared upon the face of the record in the
clerk's office; but can it be said that it materially prejudiced
and mislead the owners?    They were bound to know that
the payment of a part of the taxes did not discharge the
state's lien as to any part of the land, but only reduced the
amount to be collected.    They knew, because it is the law,
that the state had the same right to sell the whole of the
land for part of the taxes as it had to sell it for the whole
thereof.    The record showed a proper assessment against
the whole tract, and that Sanders had paid one-eighth of the
taxes.    Instead of the record misleading them it informed
them as to the exact facts, and these facts under the law
did not relieve the land, or any part of it, of the lien for
taxes.    Surely if these curative provisions are to be given
any effect they must be applied to a case like this.    It is
urged that this conclusion is not consistent with the hold-

ing in the case of *Shrewsbury* v. *Horse Creek Land Co.*, 78
W. Va. 182. There were other sufficient grounds for setting
aside the sale in that case, and the procedure there was some-
what different from the procedure in this case. It is true
that in that case the sheriff undertook to sell an undivided
interest, after part of the taxes had been paid by one of the
joint owners, but the purchasers, before taking a deed, had
an ex parte partition made of the land and took a deed for
the part they assigned to themselves. It was held that they
could not do this as this was in effect discharging the state's
lien as to part of the land, and that could not be done. The
holding in that case goes no farther than that. Had the pur-
chaser taken a deed to the whole of the land and treated the
sheriff's attempt to sell a part of it as an irregularity, the
holding in that case might have been different. There is
some language in the opinion that might bear the construc-
tion contended for when read without relation to the facts
being considered. The language of an opinion must always
be read in the light of the facts in the instant case, and qual-
ified so as to make it apply to those facts. It cannot be given
any broader meaning or more extended application. Being
thus guided in the construction of that opinion it is not in-
consistent with the conclusion we have reached in this case.

We are of opinion that there is no error in the decree of
the Circuit Court of Cabell County complained of, and the
same is affirmed.

                                        *Affirmed.*